## Fullam v. Miller Brothers

*Edward F. Chacker*, for plaintiff.
*John G. Devlin*, for defendant.

SMITH, *J.*, July 22, 2013—

## Procedural History

On February 8, 2010 the plaintiff filed a complaint for personal injuries sustained on February 19, 2008. A jury found the plaintiff 85% negligent and the defendant 15% negligent on October 4, 2012. Therefore, a verdict was entered in favor of the defendant.

Prior to trial, the plaintiff filed a motion in limine to preclude any reference to or evidence of Vicodin/narcotic medication consumption. The court granted the motion on October 1, 2012.[1] On October 1, 2012, the plaintiff made an oral motion in limine to preclude evidence concerning how she obtained the names of her treating doctors, which was denied by the court.[2] Plaintiff also made an oral motion in limine to preclude references to the fact that plaintiff injured her left foot (in this case, she injured her right foot) when she was 17, which was granted.[3]

Defense counsel sought to elicit testimony that the plaintiff had health insurance that would cover future medical expenses.[4] The court denied this request.[5] On cross, defense counsel asked the plaintiff whether her health insurance paid for her past medical expenses.[6] Plaintiff's counsel did not object.[7] This court instructed the jury not to consider any comments made regarding

1. N.T., pp.11, Oct. 1, 2012.
2. N.T., pp. 15, Oct. 1, 2012.
3. *Id.* at 15; 63-64.
4. *Id.* at 48-65.
5. *Id.* at 191-192.
6. *Id.* at 145.
7. *Id.*

the fact that plaintiff may have had health insurance as evidence in the case.[8]

The court instructed the jury that the defendant had a duty of reasonable care rather than as an occupier to a public invitee. Plaintiff agreed general negligence was preferable to an instruction defining plaintiff as a licensee, but noted an objection.[9] The court also instructed the jury that the plaintiff had a choice of ways, which plaintiff objected to.[10] The plaintiff filed a timely post-trial motion on October 12, 2012.[11] The motion was denied on November 30, 2012. This appeal follows.

## Factual History

On February 19, 2008, plaintiff sustained injuries when she fell into a hole that was partially covered by a metal plate at the intersection of 34th and Market Streets.[12] Plaintiff testified that she did not see the hole, and that it was located in the cross-walk where she was directed to walk.[13] The defendant's witnesses testified that plaintiff walked right into the clearly cordoned off construction zone despite signs that explicitly directed pedestrians where to walk.[14]

---

8. *Id.* at 65; 84 (the court instructed the jury: "By the way, ladies and gentlemen, disregard any references counsel has made about insurance. Insurance is not an issue in this case. You can't decide the case on whether plaintiff has insurance or not. Insurance — those issues won't even be discussed in this case. Do you understand? That's not how you should decide this case.")

9. N.T., pp. 5-6, Oct. 3, 2012.

10. *Id.* at 6-7.

11. *See* Pls. mot. for post-trial rel., Oct. 12, 2012.

12. N.T., pp. 90; 92; 97, Oct. 1, 2012.

13. *Id.* at 97; *see also* N.T., pp. 131, Oct. 2, 2012.

14. N.T., pp. 8-9; 49-50; 87; 94; 110-111, Oct. 2, 2012 (The area was cordoned off with tape, and was highly visible and marked with "cones, barrels, signs, barricades... beacons... red trucks... [a] police officer, [and] his flashing device. Additionally, a "sidewalk closed" sign

The construction project was "enormous."[15] Plaintiff drove past the construction site every morning before work.[16] Plaintiff saw the barrels, cones, and tape that were blocking pedestrians from crossing on Market Street and she saw the "sidewalk closed" sign directing pedestrians to a clear pathway.[17] The only way to get into that area was to go over or under the caution tape.[18] Although she was aware of and saw all the construction activity, she chose not to take an alternative route despite the fact that there were available alternative ways.[19] The defendant's witnesses testified that they followed all applicable safety standards to ensure the safety of the site.[20] Hundreds or thousands of pedestrians had walked that intersection from 7:00 a.m. until noon when the Plaintiff fell on the date of the incident.[21]

Mr. Puglizse, a foreman for Miller Brothers, witnessed the plaintiff walk around the backhoe that was within the construction zone, climb over a pile of dirt and fall.[22] When

---

directing pedestrians to cross the street and directing pedestrians to a clear path was posted 50 feet before the northbound approach of 34th Street. Plaintiff saw the sign.)

15. N.T. pp. 92, Oct. 1, 2012.

16. *Id.* at 127-131.

17. *Id.* at pp. 92-94; *see also* N.T., pp. 9; 49-50; 94 Oct. 2, 2012 (The "sidewalk closed" sign was posted 50 feet before the northbound approach of 34th Street.)

18. N.T., pp. 111, Oct. 2, 2012.

19. N.T. pp. 128-132, Oct. 1, 2012 (Plaintiff agreed that both 33rd Street or northbound 36th Street were available alternative routes. Plaintiff testified that she did not choose to take another route because she was "planning to simply go the route that [she] had always gone which was up 34th Street and to follow whatever [she] needed to do there. [She] did not know... that 3[4]th and Market was blocked with backhoes.")

20. N.T., pp. 11-39, Oct. 2, 2012.

21. *Id.* at 118.

22. N.T., pp. 115-116; 124-125, 128 Oct. 2, 2012 (Plaintiff denied

the plaintiff fell, Mike Miller, Vice-President of Miller Brothers,[23] and Mr. Puglizse came to her side to offer assistance. Plaintiff refused medical help and did not want an ambulance because she had a dentist appointment she did not want to miss.[24] Miller and Puglizse testified that the plaintiff was disoriented, and that plaintiff told them she was on painkillers for her tooth.[25] Plaintiff testified that she had only taken ibuprofen prior to the fall.[26]

Plaintiff's husband picked her up from her dentist's office and took her to the emergency room at Chestnut Hill Hospital.[27] Plaintiff injured her right foot (a fifth metatarsal base fracture).[28] She had one visit to a podiatrist at Chestnut Hill Hospital for the injury to her foot, but discontinued care with him because he was not

walking around a dirt pile.)

23. *Id.* at 14.

24. *Id.* at 99, Oct. 1, 201; N.T., pp. 15-16, Oct. 2, 2012.

25. N.T., pp. 87; 95, 111; 113; 122, Oct. 2, 2012 (Miller testified that plaintiff seemed "oblivious to the fact that she had just stepped in a ditch... to the fact that her face was just in a pile of dirt... If she had injuries she did not know or feel any pain from them. From what she told me, she told me she was on painkillers, and she told me she just had to get to the dentist." Puglizse testified that the plaintiff "stated.... that she had already been through that intersection, that she got lost and couldn't find her dentist.")

26. N.T., pp. 92, 132, Oct. 1, 2012 (On direct, plaintiff testified: "Q: Had you taken ibuprofen that day? A: I probably took two because I was going to the dentist, and it's usually a good idea." On cross-examination, the Plaintiff testified: "Q: You were not in pain? You told us that you had consumed some ibuprofen before this accident happened. A: As I do before there is going to be any dental procedure."); and *see* N.T., pp. 128, Oct. 2, 2012 (Plaintiff denied taking anything other than ibuprofen but admitted that she refused medical help because she was "dazed.")

27. *Id.* at 113-115 (Plaintiff also injured her right wrist. Plaintiff was treated by Dr. Lee three or four times for her left wrist sprain. Dr. Lee He put her in a splint and gave her exercises to do. She was sent to Dr. Lee by her cousin Nancy Fullam, who was an attorney.)

28. *Id.* at 97-103; 143; 151-152.

on her health insurance plan.[29] Subsequently she saw Dr. Shannon at Penn-Presbyterian until August of 2008 when she reached maximum improvement.[30] Although she felt initial improvement, after about a year her foot started to feel worse and she experienced difficulty walking distances and exerting pressure on it.[31] Her attorney gave her a list of physician names, and she selected Dr. Schoenhaus.[32] Dr. Shoenhaus treated the plaintiff and recommended future surgery.[33] She had health insurance, which had paid her past medical bills with the exception of some out of pocket expenses such as co-pays.[34]

## Discussion

## I. Legal Standard

Plaintiff avers that a new trial is warranted because various errors took place during the course of trial. A new trial may be granted when "the verdict is against the weight of the evidence," but "only where the verdict is so contrary to the evidence it shocks one's sense of justice."[35] Additionally, "[t]he harmless error doctrine underlies every decision to grant or deny a new trial. A new trial is not warranted merely because some irregularity occurred

---

29. *Id.* at 105.

30. *Id.* at 105-106; 110; 145; 153-155.

31. *Id.* at 115.

32. *Id.* at 15; 116 (Plaintiff's attorney brought this fact out on direct examination).

33. *Id.* at 117-118; 120-121 (At the time of the trial, plaintiff had discontinued care under Dr. Shoenhaus for approximately 12 to 18 months and had not scheduled or received the recommended surgery.)

34. *Id.* at 145-146 (Plaintiff's attorney did not make an objection. Instead he advised the court that the plaintiff was not making a claim for past medical expenses, and the court instructed defense counsel to make that clear).

35. *Kraner v. Kraner*, 841 A.2d 141, 144-45 (Pa. Super. Ct. 2004).

during the trial or another trial judge would have ruled differently; the moving party must demonstrate to the trial court that he or she has suffered prejudice from the mistake."[36]

A. Motion to Preclude References to Plaintiff's Prior Injuries

As a threshold matter, "remarks by counsel may constitute grounds for a mistrial," however, "such remarks must be beyond correction by any admonition which the court may give the jury."[37] Furthermore, comments that counsel makes do not warrant a new trial when they were "neither inflammatory nor prejudicial."[38] There are occasions when counsel's comments are beyond curative instruction and a mistrial is the only recourse to "obliterate the taint."[39]

Plaintiff cites to *Poust v. Hylton*, 940 A.2d 380 (Pa. Super. 2007) and *Siegal v. Stefanyszyn*, 718 A.2d 1274 (Pa. Super. 1998) for the proposition that a violation of an order on a motion in limine is grounds for a mistrial and also for a new trial when raised in post-trial motion. In Poust, the court granted the appellant's "motion in limine

---

36. *Harman ex rel. Harman v. Borah*, 756 A.2d 1116, 1122 (Pa. 2000).

37. *Daddona v. Thind*, 891 A.2d 786, 809 (Pa. Commw. 2006).

38. *Mansour v. Linganna*, 787 A.2d 443, 449 (Pa. Super. 2007); *see also Poust v. Hylton*, 940 A.2d 380 (Pa. Super. 2007) ("A new trial is to be granted where: the unavoidable effect of the conduct or language was to prejudice the factfinder to the extent that the factfinder was rendered incpapable of fairly weighing the evidence and entering an objective verdict. If [counsel's] misconduct contributed to the verdict, it will be deemed prejudicial and a new trial will be required.") (citing to *Commonwealth v. Francis*, 445 Pa. Super. 353, 665 A.2d 821 (1995)).

39. *Young v. Washington Hosp.*, 761 A.2d 559, 562 (Pa. Super. 2001).

to specifically preclude defense counsel from mentioning the word 'cocaine' with reference to decedent during the course of the trial."[40] Defense counsel violated the order, and the plaintiff immediately objected.[41] Plaintiff also moved for a curative instruction and a mistrial, which the court denied.[42] The appellate court noted that the trial court erred in denying the motion for mistrial.[43] Similarly, in *Siegal*, the appellee violated an order entered on a pretrial motion during closing arguments.[44] The appellant immediately objected.[45] The court gave a curative instruction. The appellate court noted that "[i]t is the duty of the trial judge to take affirmative steps to attempt to cure harm, once an offensive remark has been objected to."[46]

When plaintiff was seventeen, she suffered a minor fracture to a bone in her left foot, but had never injured her right foot prior to this incident.[47] Prior to trial this court ruled that the defendant could not mention that fact because the injury was too remote.[48] During defense counsel's opening statements he said: "By the way, this is not the first time Ms. Fullam has busted a metatarsal.... When she was 17, she broke the same bone in the left foot, the opposite foot."[49] Upon conclusion of defense

40. *Poust*, 940 A.2d at 382-83.
41. *Id.* at 383.
42. *Id.* at 384.
43. *Id.* at 385.
44. *Siegal*, 718 A.2d at 1276.
45. *Id.*
46. *Id.* at 1277 (emphasis added).
47. N.T. at 124-25, Oct 1, 2012 (Plaintiff's attorney brought this fact out on direct examination).
48. *Id.* at 15; 63-64.
49. *Id.* at 75.

counsel's opening statement, plaintiff's counsel requested a curative instruction.[50] The court took the request under advisement, but an instruction was not given.

Although the court did not give the requested curative instruction, any error was harmless error and a new trial was not warranted because the remark of defense counsel was not so inflammatory as to cause prejudice that changed the outcome of the case or influenced the verdict. Although plaintiff also brought the issue to light during direct examination, it was made clear that this was an old injury to the opposite foot. The overwhelming evidence in this case supported the verdict, and this comment was not so inflammatory or prejudicial as to have influenced the verdict in this matter.

B. Violation of Motion to Preclude References to Plaintiff's Use of Vicodin and Narcotic Intoxicants

A party has an obligation to make an objection or move for relief when there is an error that could be corrected during the course of trial.[51] Post-trial relief can only be granted where the issue is first raised in the trial court.[52] Although *Poust* and *Seigal* instruct that the trial court's failure to give a curative instruction or grant a new trial where a party has violated a motion in Limine may be grounds for reversal, the cases also highlight the fact that the offended party must object or otherwise request such relief at a time when the court is able to do so. This is

---

50. *Id.* at 82; 124 (On direct, plaintiff testified that she had a prior injury to her opposite foot at the age of 17.)
51. *Dilliplaine v. Lehigh Valley Trust Co.*, 322 A.2d 114 (Pa. 1974); *see also Straub v. Cherne Indus.*, 880 A.2d 561, 566 (Pa. 2005).
52. *Straub*, 880 A.2d at 566; *See also* Pa. R.C.P. 227.1.

in keeping with Pa.R.C.P. 227.1, which prohibits the trial court from granting post-trial relief when relief was not sought during trial at a time when the trial court could have corrected the problem.

Here, prior to closing arguments, the defendant was advised to abide by the order, and not to go beyond that which was already on the record during closing arguments. However, during closing arguments, counsel for the defendant argued:

"She testified she was on painkillers. That was her testimony. It's not something I said, it's not something Mr. Miller said, It's not something Mr. Pugliezse said. That's the words out of her own mouth, painkillers. Now counsel for plaintiff is suggesting to you it was just Ibuprofen. You can imagine what kind of painkiller she was on that day."[53]

Plaintiff did not ask for either a curative instruction or a mistrial based on defense counsel's comments concerning the plaintiff's use of painkillers. Due to plaintiff's failure to raise any objection or to request relief following defense counsel's comments, plaintiff has waived her right to relief. Nonetheless, this court acknowledges that defense counsel's comments blatantly attempted to skirt the court's

53. N.T., pp. 44; 46-47; 69, Oct. 3, 2012 (Defense counsel also argued: "And she doesn't know where she fell because she was disoriented, she's on painkillers and she's raptured in pain. She doesn't know where she fell..." "The fact of the matter is these men have an independent recollection of picking this woman up when she was in a work zone where she had no business to be. They were clear as a bell when they told you she was disoriented. She was on painkillers. That's her own words, and she was disoriented and didn't know where she was going.")

ruling. Defense counsel's comments suggested that the plaintiff was disoriented because she was on painkillers. Plaintiff waived her right to preserve this issue when she failed to raise any objection or ask for relief such as a mistrial pursuant to Pa.R.C.P. 227.1, and therefore, this court was unable to grant post-trial relief in the form of a new trial.[54]

C. Mention of Unnamed Witnesses

Plaintiff argues that during closing statements defense counsel for the first time mentioned witnesses who had not testified nor been named as witnesses (such as union shop stewards).[55] Plaintiff did not object or ask for any relief at the time of the allegedly objectionable comments nor at any time during the course of the trial. Therefore, as the issue was not raised in a timely manner prior to the conclusion of trial, plaintiff has waived her appeal rights with respect to this issue.

D. Denial of Motion in Limine to Preclude Evidence of How Plaintiff Obtained the Names of Treating Physicians.

Any party is entitled to attack the credibility of any

_____

54. This court would have likely granted relief at the time these comments were made in closing arguments had plaintiff made the request. This issue would have been discussed in a memorandum order at the time that the post-trial motions were decided, but the court did not have the benefit of the transcript at that time. The court was forced to issue an order to compel the stenographer to transcribe the notes of testimony, which were not provided to the court until June 17, 2013.

55. N.T., pp. 59-60, Oct. 3, 2012 (During closing arguments, defense counsel argued: "And let me tell you something, every union site has a shop steward. And if anybody feels, and I mean anybody, that they are any risk of personal injury they notify the shop steward... Did you hear any complaint from the union shop steward about this job site? Did they call anybody and testify that this was unsafe? The answer is no.")

witness and may bring out potential interest of any witnesses during trial.[56] A party has a broad right to inquire about an expert's bias or interest in a case. It is well settled that a "party [may]... examine an expert witness' relationship with the counsel calling the expert, including the history and amount of compensation received by the expert from counsel."[57] An expert's relationship with the attorney or law firm that hired the expert is proper subject matter for cross-examination.[58]

Here, Dr. Shoenhaus treated the plaintiff and was retained as an expert in the case. Plaintiff obtained Dr. Shoenhaus' name from her attorney. Defendant had the right to cross-examine Dr. Shoenhaus about his relationship with plaintiff's counsel in order to expose any potential bias or interest towards either side of the lawsuit. The defendant was well within its rights to cross-examine him as an expert to reveal interests and biases based upon his relationship with plaintiff's attorney. Thus, the court did not err in denying the motion to preclude references as to how the plaintiff obtained the name of Dr. Schoenhaus.

Defense counsel mentioned that plaintiff was referred to Dr. Lee for treatment of her wrist by Nancy Fullam, an attorney and plaintiff's cousin, during opening arguments. First, plaintiff testified as to her injuries, and the treatment

56. Pa. R.E. 607.

57. In *J.S. v. Whetzel*, 860 A.2d 1112, 1121 (Pa. Super. 2004); *see also Coward v. Owens-Corning Fiberglas Corp.*, 729 A.2d 614, 625-26 (Pa. Super. 1999).

58. *Mohn v. Hahnemann Med. Coll. & Hosp. of Philadelphia*, 515 A.2d 920, 923 (Pa. Super. 1986)(a party is allowed to "inquiry into a physicians personal friendship with a party to a sult or a party's attorney so as to expose his interest in or bias towards either side of the lawsuit." (citing to *Mohn*, 515 A.2d at 923.)

that she received for them. Defendant had the right to attack the credibility of that testimony by showing she was referred to Dr. Lee by an individual who had potential bias or that the doctors she saw had potential bias or interests due to their relationship with the referring party. Second, if there was any error in allowing the manner in which plaintiff obtained Dr. Lee's name, it was harmless error as the comments made by defense counsel were not so inflammatory as to cause prejudice that changed the outcome of the case or influenced the verdict.

E. References to Plaintiff's Health Insurance Coverage

Plaintiff avers that over her objection, the defendant was erroneously permitted to tell the jury that the plaintiff had health insurance. Based on plaintiff's opening statements concerning the existence of future medical bills, defense counsel sought to elicit testimony that the plaintiff would have health insurance to cover such future medical bills. This court ruled that plaintiff had already testified she had health insurance at the time of the incident, and the defendant could bring out the fact that plaintiff presently had health insurance. However, testimony could not be elicited that she would have health insurance in the future.[59] On cross-examination, defendant elicited testimony from plaintiff that she had medical insurance and that it paid her *past* medical expenses. Plaintiff's attorney did not object, and therefore waived her right to raise this issue in her post-trial motion. Additionally, this court instructed the jury not to consider any argument or testimony that plaintiff had insurance, which would have cured any

---

59. *Id.* at 191-192.

possible prejudice.

### F. Jury Instruction as to Defendant's Duty

The Restatement Second of Torts defines public invitee as "a person who is invited to enter or remain on land as a member of the public for a purpose for which the land is held open to the public."[60] Further, the courts have explained that a key aspect of defining an individual as a public invitee is the "invitation."[61] There must be evidence that the "possessor desires [the individual] to enter the land."[62] Conversely, "[a] licensee is a person who is privileged to enter or remain on land only by virtue of the possessor's consent."[63] Case law teaches that "a pedestrian walking on a public sidewalk is a licensee,"[64]

Furthermore, the duty owed to a person entering land by the occupier of the land "depends on whether the person who entered was an invitee, a licensee, or a trespasser."[65] The duty owed to a licensee by an occupier of land is one of reasonable care.[66] Pennsylvania law provides that

---

60. Restatement (Second) of Torts § 332 (1965).

61. *Palange v. City of Philadelphia, Law Dep't,* 640 A.2d 1305, 1308 (Pa. Super. 1994) (citing to Restatement (Second) of Torts § 332, comment b which notes that "[a]lthough invitation does not in itself establish the status of an invitee, it is essential to it. An invitation differs from mere permission in this: an invitation is conduct which justifies others in believing that the possessor *desires* them to enter the land; permission is conduct justifying others in believing that the possessor is *willing* that they shall enter if *they so desire*.")

62. *Id.*

63. Restatement (Second) of Torts § 330 (1965).

64. *Alexander v. City of Meadville,* 2012 PA Super 266, 61 A.3d 218, 221 (Pa. Super. Ct. 2012); *see also Peair v. Home Association of Enola Legion No.* 430 A.2d 665, 668 (1981).

65. Pa. SSJI (Civ) § 18.00 (2013).

66. Pa. SSJI (Civ), § 18.50 (2013) ("An [owner] [occupier] of land is required to use reasonable care to make the land as safe as it appears, or to disclose to the licensees the risks they will encounter.")

general negligence standards apply in cases involving road contractors.[67] Under a general negligence standard, the duty owed is of reasonable care.

Here, plaintiff asked for a jury instruction as to the defendant's duty as a person in control of the property, and asked that the plaintiff be characterized as a public invitee or in the alternative as a licensee. There was significant evidence to establish that the plaintiff fell within the cordoned off area where defendants specifically intended to keep the public away from. There is no evidence that the defendant extended an invitation, expressed a desire, or offered inducement for the plaintiff to enter the area where the plaintiff fell. Thus the jury could not be charged with an instruction that plaintiff was a public invitee. The court determined that the plaintiff's status was one of a licensee, and that the duty owed to the plaintiff was one of reasonable care, and plaintiff objected.[68] All parties agreed that in light of such ruling the instruction for general negligence should be given rather than to give an instruction defining the status of licensee.

Now plaintiff argues that the court erred in not defining the plaintiff as either a public invitee or in the alternative as a licensee. At trial, although the court's stated intention was to instruct the jury as to plaintiff's status as a

---

[67]. *De Haas v. De Haas*, 391 Pa. 76, 81, 137 A.2d 258, 261 (Pa. 1958) (the plaintiff, who was a passenger in a vehicle, was injured when the driver collided with "a boulder imbedded in a three-foot pile of earth" which was in the road as part of a highway construction project. The court noted that "[t]he appellant, while repairing that highway, owed to him the obligation of reasonable care." *De Haas* establishes that general negligence standards apply to cases involving injuries obtained in the area of road construction.)

[68]. N.T., pp. 5, Oct. 3, 2012.

licensee, plaintiff specifically objected to an instruction on the plaintiff's status as licensee being given. Plaintiff asked instead for an instruction on general negligence in light of the court's decision not to read the charge as to public invitee. Whether the court had read the general negligence charge or a charge defining what a licensee is, the duty is the same: reasonable care. There was no basis for instructing the jury as to the duty owed to a public invitee. The charge on general negligence allowed the jury to properly decide whether the defendant breached a duty of reasonable care. The jury so found, but found that plaintiff's own negligence was greater than that of the defendant's negligence. Any error that may have occurred was harmless error because the jury found the defendant negligent, but found the plaintiff's negligence to exceed that of the defendant's.

Finally, the defendant agreed that it was an occupier of the premises.[69] That duty depends upon the status of the plaintiff. Since plaintiff was not a public invitee, and plaintiff objected to a jury instruction defining the status of licensee, it was proper to give only the standard negligence charge without defining the defendant's status, Thus, this court did not err in charging the jury as to general negligence.

G. Court's Denial of Corrective Instruction as to Defendant's Presentation of Evidence that Nobody Else Fell at the Accident Site on the Time and Date of the Incident.

---

69. N.T., pp. 148-161, Oct. 2, 2012.

Case law indicates that "evidence of similar accidents occurring at substantially the same place and under the same or similar circumstances may, in the sound discretion of the trial Judge, be admissible to prove constructive notice of a defective or dangerous condition and the likelihood of injury."[70] Furthermore, "evidence that no other accidents occurred, despite similar conditions, may be admissible to prove there was no dangerous condition."[71] In *DiBuono v. A. Barletta & Sons, Inc.*, 560 A.2d 893, 896 (Pa. Cmwlth. 1989) the "[a]ppellant... argue[d] that the trial judge erred in failing to allow its proffered testimony regarding the absence of accidents at the construction site for the ninety-two days preceding the accident at issue." The Commonwealth Court found that the trial court committed no error because testimony demonstrated that "the lighting and traffic pattern had been changed within two weeks of the accident."[72]

Here, the court properly allowed evidence and argument as to the absence of prior accidents that occurred at the same time and place under the same circumstances. Unlike the facts in *DiBuono*, the arguments and testimony of absence of prior similar accidents involved the same place and in the same time frame. There was no showing

---

70. *Whitman v. Riddell*, 324 Pa. Super. 471 A.2d 521, 523 (Pa. Super. 1984) (citing from *Stormer v. Alberts Construction Co.*, 165 A.2d 87, 89 (Pa. 1960)); *see also DiBuono v. A. Barletta & Sons. Inc.*, 560 A.2d 893, 896 (Pa. Cmwlth. Ct. 1989) (citing from *Ringelheim v. Fidelity Trust Company of Pittsburgh*, 198 A.628, 629 (Pa. 1938)).

71. 1 West's Pa. Prac., Evidence § 421-2 (4th ed.); *Orlando v. Herco, Inc.*, 351 Pa. Super. 144, 148, 505 A.2d 308, 310 (1986) ("[T]he fact that all other shrimp creole sold that evening, prepared at the same time and using common ingredients, was found to be fit for human consumption was a relevant fact for the jury to consider.")

72. *DiBuono*, 560 A.2d at 896.

that circumstances had substantially changed as they did in *DiBuono*. The evidence and arguments were properly presented to show that other pedestrians followed the defendant's warnings and signage and that there was no dangerous condition within the cross-walk area where the defendant had directed pedestrian traffic. Plaintiff testified that she fell in the cross-walk where the defendant directed people to walk. The defendant's witnesses contradicted plaintiff's assertion by testifying that plaintiff crossed the barricade and entered an area where she was not permitted to be. This evidence was properly allowed to show that at that same time and place many other people properly followed the signs and warnings to take the proper path without any incident or accident of a similar nature occurring. Therefore, this court did not err in declining to give a corrective instruction.

H. Instruction on Choice of Ways.

A plaintiff may be held contributorily negligent "'[w]here a person, having a choice of two ways, one of which is perfectly safe, and the other of which is subject to risks and dangers, voluntarily chooses the latter and is injured, he is guilty of contributory negligence and cannot recover."[73] In order to justify a jury instruction on choice of ways, "There must be evidence of (1) a safe course, (2) a dangerous course, and (3) facts which would put a reasonable person on notice of the danger or actual knowledge of the danger."[74]

---

73. *Downing*, 371 A.2d at 956 (citing from *Haven v. Pittsburgh & Allegheny Bridge Co.*, 151 Pa. 620, 25 A.311 (Pa. 1892)).
74. *Id.* at 956.

In *Downing v. Schaffer*, 371 A.2d 953, 957 (Pa. Super. 1977), it was shown that "if appellant turned right, she risked being struck by a car... [and] [i]f she turned left, she risked being struck by a car." As such, the "Appellant's choice of routes... [were] equally dangerous," and "no evidence was presented which would allow the jury to conclude that there was a safe route which the appellant failed to take."[75] Conversely, in *Stowe v. Booker*, 424 A.2d 1388, 1391 (Pa. Super. 1981), the plaintiff stepped into an intersection from behind an illegally parked vehicle and was hit by a car. The court noted that there was evidence that (1) a safe course existed; (2) the plaintiff "was familiar with the area and the busy nature of 22nd Street," (3) "a person familiar with 22nd Street would appreciate the danger involved in stepping out from behind a truck into the street when the truck blocked both [the Plaintiff's] view of traffic and driver's view of [the Plaintiff]."[76]

Here, there was evidence of several safe courses, evidence of a dangerous course, and facts that would have put a reasonable person on notice of the danger or actual knowledge of the danger. First, there was testimony that plaintiff could have followed the signs instructing her where to walk to avoid the cordoned off area of construction she walked through. There was also testimony that both 33rd Street or northbound 36th Street were both safe available alternative routes. Plaintiff testified that she did not choose to take another route because she was "planning to simply go the route that [she] had always gone which was up 34th Street and to follow whatever [she] needed to do there."

75. *Id.* at 957.
76. *Stowe* 424 A.2d at 1391.

Second, there was testimony that the route that plaintiff chose to take was dangerous. There was testimony and evidence that plaintiff walked into a cordoned off area of construction where pedestrians were not permitted to be. There was active construction activity going on in the area where plaintiff fell. It was cordoned off because it was not a safe area for pedestrians to walk through. Third, there was evidence that a reasonable person would have been on actual or constructive notice of the danger of the course she took. Plaintiff was fully aware of the fact that construction activity was taking place at 34th and Market Streets because she worked nearby and drove past the site every morning on her way to work. The construction site was enormous. Plaintiff saw the barrels, cones, and tape that were blocking pedestrians from crossing straight on Market Street and she saw the "sidewalk closed" sign directing pedestrians to a clear pathway.

Although the plaintiff testified that she fell within the cross-walk the defendants directed her to follow, there was significant testimony and evidence that in fact she crossed over the barriers and walked into the cordoned off area of construction where she was not permitted to be. Thus, there was sufficient evidence that a safer route existed, and that plaintiff chose to take a route that was clearly dangerous. Therefore, it was proper for the court to instruct the jury as to the plaintiff's choice of ways.

This court respectfully requests that the Superior Court affirm.